**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PHILLIP WILLIAMS; DEVIN JOHNSON; BACKWARD HAT CAPITAL FUND LP; BH CAPITAL FUND I LP; BH CAPITAL FUND III LP; BH CAPITAL FUND IV LP; BHC V LLC; BH CAPITAL FUND VI LP; BH CAPITAL FUND IX LP; BACKWARD HAT GROUP LLC; BH CAPITAL FUND X LP; BH CAPITAL FUND IX – 2 LP; and BACKWARD HAT CAPITAL MANAGEMENT LLC,**<br><br>**Defendants;**<br><br>**WILLIAM CODY HARVEY; KMAP INC.; ALLEN JOHNSON GROUP LLC; WILLIAM HARVEY GROUP, LLC,**<br><br>**Relief Defendants.** | **Civil Action No.** 1:26-cv-2477-RLY-CSW<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS**<br><br>**FILED**<br>**11/17/2026**<br>U.S. DISTRICT COURT<br>SOUTHERN DISTRICT OF INDIANA<br>Kristine L. Seufert, Clerk |

Plaintiff Commodity Futures Trading Commission ("CFTC") alleges as follows:

## I. SUMMARY

1. From at least July 28, 2022 to the present (the "Relevant Period"), Defendants Phillip Williams ("Williams"), Devin Johnson ("Johnson"), and the entities collectively referred to herein as the "Backward Hat Common Enterprise"[1] (together with Williams and Johnson,

[1] The "Backward Hat Common Enterprise" collectively refers to the following Defendants, all of which Williams controlled and operated as a single common enterprise: Backward Hat Capital Fund LP; BH Capital Fund I LP; BH Capital Fund III LP; BH Capital Fund IV LP; BHC V LLC; BH Capital Fund VI LP; BH Capital Fund IX LP;

"Defendants") engaged in a fraudulent Ponzi scheme by soliciting individuals ("pool participants") to participate in a commodity pool in the name of Backward Hat (the "Backward Hat Pool"). Defendants represented that the Backward Hat Common Enterprise would use pool participant funds to trade leveraged retail foreign currency ("forex") contracts, and they promised pool participants 80% of the profits from such trading, less management fees, costs, and expenses. Defendants touted a remarkable historical trading performance, claiming multiple years of monthly gains exceeding 6% without suffering a single losing month, and they shared with pool participants purported Audit and Quality of Earnings Reports claiming the same. Defendants also circulated account statements purporting to show trading profits and growing account balances for each pool participant. In response to these representations and documents, at least 2,100 pool participants contributed at least $556 million to the Backward Hat Pool.

2. In reality, these representations were false. Defendants operated a Ponzi scheme that engaged in little, if any, forex trading. Instead of using pool participant funds to trade forex as promised, Defendants misappropriated most pool participant contributions for their personal use or to pay fake trading "profits" to other pool participants. Defendants also transferred misappropriated pool participant funds to various entities and individuals, including KMAP Inc. ("KMAP," owned and controlled by Williams), Allen Johnson Group LLC ("Johnson Group," owned and controlled by Johnson), William Cody Harvey ("Harvey," an Officer and Director of multiple entities in the Backward Hat Common Enterprise), and William Harvey Group, LLC ("Harvey Group," owned and controlled by Harvey; and together with Harvey, KMAP, and Johnson Group, the "Relief Defendants").

---

Backward Hat Group LLC; BH Capital Fund X LP; BH Capital Fund IX – 2 LP; and Backward Hat Capital Management LLC.

3. By engaging in this conduct and the conduct described herein, Defendants have engaged, are engaging, and/or are about to engage in acts and practices in violation of Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A)–(C), 4k(2), 4m(1), 4*o*(1)(A)–(B), and 6(c)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)–(C), 6k(2), 6m(1), 6*o*(1)(A)–(B), 9(1), and CFTC Regulations ("Regulations") 4.20(a)(1), (b), (c), 5.2(b)(1)–(3), 5.3(a)(2)(i), (ii), and 180.1(a)(1)–(3), 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.2(b)(1)–(3), 5.3(a)(2)(i), (ii), 180.1(a)(1)–(3) (2026).

4. Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint or in similar acts and practices.

5. The CFTC brings this action pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and compel their compliance with the CEA and Regulations. The CFTC also seeks civil monetary penalties, restitution, disgorgement, trading and registration bans, rescission, and pre- and post-judgment interest from Defendants, disgorgement from Relief Defendants, and such other relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by act of Congress). In addition, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief and other relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a

violation of the CEA or any rule, regulation, or order thereunder, and provides that U.S. district courts "shall have jurisdiction to entertain such actions."

7. Venue properly lies with the Court pursuant to 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, and/or are about to occur within this District, among other places.

## III. THE PARTIES

### A. Plaintiff

8. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA and Regulations.

### B. Defendants

9. Defendant **Phillip Williams** is a resident of Kokomo, Indiana. During the Relevant Period, Williams was an Executive Officer and Director of multiple entities in the Backward Hat Common Enterprise, and he was the Indiana Registered Agent for every entity in the Backward Hat Common Enterprise. Williams was a signatory for every Backward Hat Common Enterprise bank account (and the sole signatory on all but three accounts), he opened, operated, and controlled the Backward Hat Common Enterprise's Coinbase account ("Coinbase Account"), and he was the signatory on Private Placement Memoranda ("PPMs") and related agreements with pool participants governing pool participants' contributions to the Backward Hat Pool. Williams's home address was the publicly listed address for all but one entity in the Backward Hat Common Enterprise (and that entity's address was also associated with Williams). Williams operated and controlled the Backward Hat Common Enterprise and acted as an Associated Person ("AP") of the Backward Hat Common Enterprise, which acted as a

commodity pool operator ("CPO"), during the Relevant Period. Williams has never been registered with the CFTC in any capacity.

10. Defendant **Devin Johnson** is a resident of Zionsville, Indiana. During the Relevant Period, Johnson was an Executive Officer and Director of multiple entities in the Backward Hat Common Enterprise, and he was the Indiana Registered Agent for multiple entities in the Backward Hat Common Enterprise until 2024 or 2025 (depending on the entity). Johnson was a signatory for two Backward Hat Common Enterprise bank accounts, including one account that directly received nearly 70% of pool participant funds. Johnson acted as an AP of the Backward Hat Common Enterprise CPO during the Relevant Period. Johnson has never been registered with the CFTC.

11. Defendant **Backward Hat Capital Fund LP** is an Indiana limited partnership formed in April 2022 that lists as its principal place of business the business address of an unrelated business in Noblesville, Indiana where Williams previously worked as an investment advisor. During the Relevant Period, Backward Hat Capital Fund LP was a counterparty to certain PPMs with pool participants; owned the Coinbase Account; accepted pool participant contributions to the Backward Hat Pool in a bank account that it owned and for which Williams, Johnson, and Harvey were signatories; and misappropriated pool participant funds from that account by distributing fictitious trading profits to certain pool participants, sending funds to the Coinbase Account for reasons other than forex trading, and transferring funds to various Relief Defendants. Backward Hat Capital Fund LP has never been registered with the CFTC in any capacity.

12. Defendant **Backward Hat Capital Management LLC** is an Indiana limited liability company formed in April 2022 that lists Williams's home address in Kokomo, Indiana as

its principal place of business. Backward Hat Capital Management LLC is the general partner of Backward Hat Capital Fund LP. During the Relevant Period, Backward Hat Capital Management LLC possessed pool participant funds in a bank account that it owned and for which Williams, Johnson, and Harvey were signatories, and it misappropriated hundreds of millions of dollars from that account by distributing fictitious trading profits to certain pool participants, sending funds to the Coinbase Account for purposes other than forex trading, and transferring funds to various Relief Defendants. Backward Hat Capital Management LLC has never been registered with the CFTC in any capacity.

13. Defendant **BH Capital Fund I LP** is an Indiana limited partnership formed in December 2022 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BH Capital Fund I LP was a counterparty to certain PPMs with pool participants and accepted pool participant contributions to the Backward Hat Pool in a bank account it owned and for which Williams was a signatory. BH Capital Fund I LP has never been registered with the CFTC in any capacity.

14. Defendant **BH Capital Fund III LP** is an Indiana limited partnership formed in December 2022 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BH Capital Fund III LP accepted pool participant contributions to the Backward Hat Pool in a bank account it owned and for which Williams was a signatory. BH Capital Fund III LP has never been registered with the CFTC in any capacity.

15. Defendant **BH Capital Fund IV LP** is an Indiana limited partnership formed in January 2023 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BH Capital Fund IV LP was a counterparty to certain

PPMs with pool participants. BH Capital Fund IV LP has never been registered with the CFTC in any capacity.

16. Defendant **BH Capital Fund VI LP** is an Indiana limited partnership formed in February 2023 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BH Capital Fund VI LP was a counterparty to certain PPMs with pool participants and accepted pool participant contributions to the Backward Hat Pool in a bank account it owned and for which Williams was a signatory. BH Capital Fund VI LP has never been registered with the CFTC in any capacity.

17. Defendant **BH Capital Fund IX LP** is an Indiana limited partnership formed in March 2023 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BH Capital Fund IX LP was a counterparty to certain PPMs with pool participants. BH Capital Fund IX LP has never been registered with the CFTC in any capacity.

18. Defendant **BH Capital Fund IX - 2 LP** is an Indiana limited partnership formed in October 2024 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BH Capital Fund IX - 2 LP was a counterparty to certain PPMs with pool participants. BH Capital Fund IX - 2 LP has never been registered with the CFTC in any capacity.

19. Defendant **BH Capital Fund X LP** is an Indiana limited partnership formed in May 2023 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BH Capital Fund X LP was a counterparty to certain PPMs with pool participants. BH Capital Fund X LP has never been registered with the CFTC in any capacity.

20. Defendant **BHC V LLC** is an Indiana limited liability company formed in January 2023 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, BHC V LLC accepted pool participant contributions to the Backward Hat Pool in a bank account it owned and for which Williams was a signatory and misappropriated pool participant funds by transferring certain of those funds to various Relief Defendants. BHC V LLC has never been registered with the CFTC in any capacity.

21. Defendant **Backward Hat Group LLC** is an Indiana limited liability company formed in April 2023 that lists Williams's home address in Kokomo, Indiana as its principal place of business. During the Relevant Period, Backward Hat Group LLC accepted pool participant contributions to the Backward Hat Pool in a bank account it owned and for which Williams was a signatory. Backward Hat Group LLC has never been registered with the CFTC in any capacity.

**C. Relief Defendants**

22. Relief Defendant **William Cody Harvey** is a resident of Bargersville, Indiana. During the Relevant Period, Harvey was an Executive Officer and Director of multiple entities in the Backward Hat Common Enterprise and was a signatory for two relevant Backward Hat Common Enterprise bank accounts, including one account that directly received nearly 70% of pool participant funds.

23. Relief Defendant **KMAP Inc.** is an Indiana corporation formed in March 2022 that lists Williams's home address in Kokomo, Indiana as its principal place of business. Williams is the co-owner (with his wife), Registered Agent, and CEO of KMAP, Inc.

24. Relief Defendant **Allen Johnson Group LLC** is an Indiana limited liability company formed in November 2019 with its principal place of business in Indianapolis, Indiana.

Johnson is the Principal, Manager, sole Member, and Registered Agent of Allen Johnson Group LLC.

25. Relief Defendant **William Harvey Group, LLC** is an Indiana limited liability company formed in August 2019, and administratively dissolved in February 2026, with its principal place of business in Indianapolis, Indiana. During the Relevant Period, Harvey was the Principal, sole Member, and Registered Agent of William Harvey Group, LLC.

## IV. FACTS

### A. Willams Created the Backward Hat Common Enterprise to Defraud Pool Participants.

26. To create the illusion of a sophisticated and legitimate fund management structure, Williams created the Backward Hat Common Enterprise, which had no apparent business operations beyond operating the fraudulent scheme described herein.

27. Defendants operated the fraudulent scheme through the Backward Hat Common Enterprise, which served as a counterparty to PPMs and opened bank accounts that accepted, held, and/or transferred pool participant funds.

28. Defendants did not explain to pool participants that there were various entities in the Backward Hat Common Enterprise, and at times Defendants expressly represented to pool participants that there was a single fund trading forex.

29. All but one entity in the Backward Hat Common Enterprise, as well as the nearly 50 additional Backward Hat entities that Williams created, shared the same address (Williams's home address), and every entity in the Backward Hat Common Enterprise shared the same registered agent (originally Johnson or Williams, and now exclusively Williams).

30. The Backward Hat Common Enterprise maintained a single website (bhgroup.io) that listed "BH Capital" as the entity doing business.

31. The Backward Hat Common Enterprise utilized the same employees. For example, an individual who identified himself as an Investor Relations representative for BH Capital ("Employee 1")—who Williams and Johnson supervised—emailed pool participants from a single email address ([Employee 1]@bhcapital.io) without distinguishing which entity in the Backward Hat Common Enterprise he represented and soliciting contributions to "BH Capital" while providing PPMs issued by different entities within the Backward Hat Common Enterprise.

32. Frequently, one entity in the Backward Hat Common Enterprise entered into a PPM with a pool participant, and another entity in the Backward Hat Common Enterprise accepted funds from that pool participant in a bank account that it owned. Further, upon receiving funds from pool participants, the Backward Hat Common Enterprise frequently commingled those funds by transferring and accepting these funds among their various bank accounts, without regard to which entity received the pool participant's contribution.

**B. Defendants Operated a Ponzi Scheme That Engaged in Little, If Any, Forex Trading and Misappropriated Most Pool Participant Funds.**

33. In its PPMs with pool participants (which were signed by "[Employee 1] on behalf of Phil Williams"), the Backward Hat Common Enterprise promised to accept customer funds in the Backward Hat Common Enterprise's bank accounts, transfer the funds to the Backward Hat Common Enterprise's crypto asset exchange wallet, convert the funds to crypto assets, and send those crypto assets to a forex broker to begin trading. Pool participants were entitled to the purported trading profits, less 20% of the profits that were paid to the Backward Hat Common Enterprise, a 2% management fee, and certain other costs and expenses.

34. In reality, Defendants misappropriated nearly all pool participant funds for personal use and to pay fake trading returns and return principal to other pool participants.

35. During the Relevant Period, Defendants received over $556 million in contributions from pool participants. Defendants misappropriated those funds by making transfers from three Backward Hat Common Enterprise bank accounts. Williams was a signatory for each of these accounts, and Johnson was a signatory for two of the three accounts. Through these bank accounts, Defendants used at least $303 million to make Ponzi payments back to other pool participants, instead of trading forex as promised. In addition, Defendants transferred around $92.9 million to KMAP (controlled by Williams), around $41.4 million to the Johnson Group (controlled by Johnson), and around $27.3 million to the Harvey Group (controlled by Harvey). Defendants retained around $500,000 in pool participant funds in Backward Hat Common Enterprise bank accounts, where the funds remained as of October 9, 2026.

36. Defendants also transferred around $91 million in pool participant funds to the Coinbase Account, which Williams operated and controlled, and which received over $2.7 million from other sources. But rather than use those funds to trade forex, as promised, the Backward Hat Common Enterprise transferred approximately $51.4 million from the Coinbase Account to Williams's personal crypto asset exchange wallets; approximately $2.4 million to Johnson's personal crypto asset exchange wallets; approximately $3 million to Harvey's personal crypto asset exchange wallet; approximately $40.2 million to overseas platforms—where the accounts did not engage in forex trading but instead bought and sold crypto assets and/or transferred funds to other wallets—and from which $7.5 million was returned to the Coinbase Account; approximately $3.6 million to overseas platforms where the disposition of the funds is not currently known to the CFTC; and around $432,000 in the form of Ponzi payments to pool participants.

37. Defendants often misappropriated pool participant funds for Williams's and Johnson's personal use shortly after the funds were received. For example, on Friday July 11, 2025, the ending balance in the Backward Hat Common Enterprise's bank accounts was around $2.6 million of predominantly or exclusively pool participant funds. On Monday July 14, 2025, pool participants contributed around $1.37 million. That day, the Backward Hat Common Enterprise sent around $1 million to the Coinbase Account and then on to Williams's personal crypto asset wallet where it was converted to cash and transferred to Williams's personal bank account; and sent an additional $350,000 to Johnson. Similarly, on August 14, 2025, the ending balance in the Backward Hat Common Enterprise's bank accounts was around $3 million. On August 15, 2025, pool participants contributed around $4.3 million. The same day, the Backward Hat Common Enterprise sent around $4.85 million to the Coinbase Account and then on to Williams's personal crypto asset wallet, made over $1 million in Ponzi payments, and sent over $800,000 to the Harvey Group. Likewise, on November 12, 2024, the ending balance in a Backward Hat Common Enterprise bank account was approximately $286,000. On November 13, 2024, pool participants deposited nearly $950,000 into that bank account. The same day, that bank account transferred $500,000 to a Johnson Group bank account.

38. From around September 19, 2025 through at least October 9, 2026, Defendants did not transfer any customer funds to the Coinbase Account, much less use those funds to trade forex. Instead, of the approximately $350 million received from pool participants during this period (plus around $2.6 million transferred to Backward Hat Common Enterprise bank accounts from the Coinbase Account and $2.7 million received from other sources, from a starting balance on September 19, 2025 of around $59,000), Defendants made around $236 million in Ponzi payments to other pool participants, misappropriated around $122 million by transferring funds

to KMAP, Johnson Group, Johnson, and Harvey Group, paid around $170,000 in various expenses, and retained around $509,000 in Backward Hat Common Enterprise bank accounts. For example, in April 2026, Defendants received around $30.5 million in pool participant contributions, returned around $15.8 million to pool participants in the form of Ponzi payments, transferred around $12.6 million to KMAP, Johnson Group, and Harvey Group, made around $635,000 in other transfers, and retained around $1.5 million in the Backward Hat Common Enterprise bank accounts. Similarly, in September 2026, the Backward Hat Common Enterprise began the month with around $3 million in its bank accounts, received around $15.1 million in pool participant contributions and around $700,000 from other sources, made around $13.4 million in Ponzi payments, transferred around $4.9 million to KMAP, Johnson Group, and Harvey Group, paid around $100,000 in miscellaneous expenses, and ended the month with around $400,000 in the account.

39. Williams (including through his KMAP account) used misappropriated pool participant funds for personal spending, including millions of dollars to pay credit card bills, millions of dollars in transfers to other accounts and business entities he owned or controlled, over $3.2 million for apparent real estate purchases, $3 million to an apparent bare knuckle fighting promoter, over $400,000 to pay title insurance, over $11 million to an apparent auto racing team, $1.8 million for apparent luxury car garage space, and nearly $60,000 to a landscaping company.

40. Johnson (including through his Johnson Group account) also used misappropriated pool participant funds for personal spending, including hundreds of thousands of dollars to pay credit card bills and fund transfers to other accounts and business entities he owned or controlled, over $1.5 million to apparent private jet management and charter

companies, over $1 million for apparent real estate transactions, over $900,000 to apparent luxury car dealers, $500,000 for an apparent auto racing sponsorship, and over $500,000 for jewelry and luxury watches.

**C. Defendants Falsely Promised to Use Pool Participant Funds to Trade Leveraged Retail Forex.**

41. Defendants misappropriated pool participant funds while unambiguously representing to customers, in PPMs or otherwise, that they would use those funds to trade forex.

42. The Backward Hat Common Enterprise issued the PPMs and entered into agreements with pool participants to contribute to the Backward Hat Pool. The PPMs reflected Williams's role as a point person in the Backward Hat Common Enterprise by directing pool participants to direct their inquiries to the Backward Hat Common Enterprise, "c/o: Mr. Phillip Williams." (One early version of the PPM also listed "c/o Mr. Devin Johnson" for inquiries.) Multiple PPMs also included an appended Subscription Agreement with Williams's name on the signature block as well as a Limited Partnership Agreement signed by Williams on behalf of the Backward Hat Common Enterprise. The PPMs were signed "[Employee 1] on behalf of Phil Williams" and were entered into throughout the Relevant Period, for example on May 30, 2024, July 10, 2024, February 20, 2025, and April 10, 2025. As noted above, through these PPMs, the Backward Hat Common Enterprise and Williams represented that the Backward Hat Common Enterprise would accept customer funds, convert the funds to crypto assets, and send the funds to a broker to trade forex. Similarly, multiple PPMs stated that the Backward Hat Common Enterprise "focus[ed] on trading Forex pairs utilizing [its] proprietary automation and algorithms to generate returns" for pool participants.

43. Williams was a point person in soliciting prospective pool participants to contribute to the Backward Hat Pool on behalf of the Backward Hat Common Enterprise. For

example, a public SEC filing by Defendant Backward Hat Group LLC lists Williams as receiving sales compensation in connection with soliciting contributions to the Backward Hat Pool in every U.S. state. To this end, on or about February 28, 2023, a contact put a prospective pool participant in touch with Williams to discuss a potential contribution to the Backward Hat Pool. Williams replied from an email address phil@bhcapital.io with a signature block identifying him as the General Partner of "BH Capital." Williams provided the prospective pool participant with a PPM and Limited Partnership Agreement.

44. Likewise, Johnson regularly solicited prospective pool participants to contribute to the Backward Hat Pool, including through Zoom calls, in the offices of another business owned by Johnson, at events related to the Indianapolis 500, and at other events around the United States. Johnson made misrepresentations when soliciting prospective pool participants. For example, in or around April 2025, Johnson told a prospective pool participant that the Backward Hat Common Enterprise used an artificial intelligence algorithm to trade forex by taking advantage of price inefficiencies between foreign currencies. And in or around July 2025, Johnson told a prospective pool participant that the Backward Hat Common Enterprise converted pool participant funds to Bitcoin and then used that Bitcoin to trade forex.

45. In at least one instance, Johnson admitted to a prospective pool participant that the Backward Hat Common Enterprise had once operated as a Ponzi scheme but then claimed that it was now profitably trading forex. Johnson possessed in his email account an AI-generated meeting summary of a December 15, 2025 meeting between Johnson and a prospective pool participant who was considering referring others to contribute to the Backward Hat Pool. The summary states, "Devin assured [the prospective pool participant] that the [Backward Hat Common Enterprise] had stopped running Ponzi schemes . . . and reviewed trading data,

focusing on Forex options for the top five currency pairs, highlighting a 70% success rate with a mix of winning and losing trades."

46. The Backward Hat Common Enterprise also made material misrepresentations in written materials. For example, in a diligence questionnaire the Backward Hat Common Enterprise provided to multiple pool participants, the Backward Hat Common Enterprise claimed to deploy pool participant funds through account(s) at a Cyprus-based forex trading platform and broker named Broctagon Prime (misspelled "Broctogan" in the diligence questionnaire). No Defendant held an account at Broctagon Prime. The Backward Hat Common Enterprise did transfer around $15 million in pool participant funds overseas to a Broctagon Prime affiliate that maintained an account at a Singapore-based trading platform, but that affiliate account simply bought and sold crypto assets and did not trade forex.

47. The Backward Hat Common Enterprise represented to pool participants that it would trade forex on a leveraged basis. For example, the Backward Hat Common Enterprise provided to pool participants a sham "Independent Financial Audit 2023-2025" of "BH Capital Fund" ("Audit Report") that claimed that the Backward Hat Common Enterprise maintained a leverage ratio of under 4:1. Similarly, in the above-referenced diligence questionnaire, the Backward Hat Common Enterprise claimed to use leverage of up to 3:1 in forex trading.

48. These representations were false because Defendants engaged in little, if any, forex trading during the Relevant Period.

49. Defendants accepted funds from pool participants without regard to pool participants' income status or net worth. For example, a Backward Hat Common Enterprise representative ("Employee 2") told one prospective pool participant that the Backward Hat Common Enterprise did nothing to verify whether investors were accredited, noting that the

Backward Hat Common Enterprise would take money from anyone who wished to contribute. Multiple pool participants were not eligible contract participants ("ECPs") as defined in Section 1a(18)(A)(xi) of the CEA, 7 U.S.C. § 1a(18)(A)(xi) (*i.e.*, an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual transacts to manage certain specified risks).

50. Defendants engaged in the conduct described in this Complaint while using the mails or other instrumentalities of interstate commerce, including through emails and transfers of fiat currency between bank accounts and of crypto assets on the blockchain.

**D. Defendants Falsely Touted Grossly Inflated Historical Trading Returns and Promised Pool Participants Unrealistic Trading Profits.**

51. To convince prospective pool participants to contribute to the Backward Hat Pool, Defendants falsely claimed they had achieved extraordinary returns trading forex.

52. When soliciting prospective pool participants, Defendants made (or supervised or controlled others who made) extensive misrepresentations regarding the Backward Hat Common Enterprise's trading performance. For example, in or around February 2023, Johnson attended a meeting of prospective pool participants in Florida, at which another individual, acting on behalf of the Backward Hat Common Enterprise, made false statements about the Backward Hat Pool. Among other false statements, the individual claimed that the Backward Hat Common Enterprise used a forex arbitrage algorithm to achieve 8%-10% monthly returns, had achieved monthly returns between 9.92% and 20.13% between February and December 2022, and had achieved a cumulative gain of 498.46% between January 2022 and January 2023. In or around March 2025, Johnson falsely told a prospective pool participant that the Backward Hat Common Enterprise averaged over 6% gains per month and over 100% gains per year. And in or around July 2025, Johnson told another prospective pool participant that he worked with a firm to

develop an algorithm that consistently generated forex trading returns of 7% per month, that his worst month ever was 5%, and that Johnson had made $27 million from the Backward Hat Common Enterprise during the previous year. Significantly, in late 2025, Johnson suggested that an existing pool participant contribute more money to the Backward Hat Pool, suggesting that the pool participant could take out a personal loan and claiming that the Backward Hat Common Enterprise earned annual returns of over 100%—and thus the returns would easily cover any interest rate payment the pool participant had to make on a personal loan.

53. On or about August 21, 2025, Johnson solicited contributions from a prospective pool participant, touting the Backward Hat Common Enterprise's "Proven Track Record" of "five years [of] consistent returns." Johnson wrote in an email, "I completely understand skepticism around strong returns. However, many funds have successfully executed similar FX trading models for decades . . . . These firms prove that structured, risk-managed FX trading is sustainable long-term. Our success is not based on chance—it's built on the same disciplined approach, combined with proprietary technology that increases efficiency."

54. According to the AI-generated summary of the December 15, 2025 meeting discussed above, "[Johnson] highlighted [to the prospective pool participant] the success of [the Backward Hat Common Enterprise's] trading algorithms, with a 70% win ratio and a total profit of $33 million in 2023 . . . ." The summary further states that Johnson claimed "[pool participant] gains of $64 million" in 2024 . . . [and] that the [Backward Hat Pool] ha[d] been experiencing strong returns, with a 60% projected annual return . . . ."

55. At a dinner held for pool participants in Utah in or around December 2025, representatives of the Backward Hat Common Enterprise presented extraordinary purported historical returns, including three-year average monthly net returns of 4.8% and over 76% gross

annualized returns, from the Backward Hat Common Enterprise's supposed "forex pair arbitrage utilizing our proprietary automation and algorithms."

56. As of March 2026, the Backward Hat Common Enterprise investor portal represented historical monthly returns from March 2024 through February 2026, reflecting purported monthly gains ranging from 6.01% to 7.03%.

**E. Defendants Circulated a Sham Audit Report and Quality of Earnings Report Describing Fake Backward Hat Trading Profits.**

57. On or about August 21, 2025, following a supposed review period culminating in July 2025, the Backward Hat Common Enterprise caused a third party to issue an Audit Report that was "intended . . . for" pool participants. The Audit Report claimed consistent monthly trading returns of over 6% and asserted that the supposed auditor had "conducted a quality-of-earnings reconciliation that verified all reported trading gains as attributable to realized market positions, not revaluations or mark-to-model assumptions." These representations were false, as the Backward Hat Common Enterprise was not trading forex as promised or achieving those returns.

58. Similarly, around the same time, the Backward Hat Common Enterprise caused the same third party to issue a Quality of Earnings Report making similar false claims, including that the Backward Hat Common Enterprise "specializ[ed] in algorithmic foreign exchange (FX) trading," achieved "average monthly gross return[s] of approximately 6.3%," and achieved over $163 million "in total economic gains" from August 2024 to July 2025. The Quality of Earnings Report falsely asserted that "[Backward Hat Common Enterprise] results are driven by recurring, systematic earnings derived from disciplined FX trading rather than one-off events."

59. The Backward Hat Common Enterprise, through its employees and/or agents, requested edits to, and ultimately signed off on, the supposedly independent Quality of Earnings

Report. On or about August 20, 2025, the CEO of the third party who issued the report emailed a draft of the report to an employee of another company owned by Johnson, copying Johnson. The employee replied, copying Johnson, that the Quality of Earnings Report should reflect the gross trading gains achieved by the Backward Hat Common Enterprise's supposed forex trading (not just the net gains to pool participants after fees), provided a document reflecting those supposed gross gains, and noted that "[e]verything else look[ed] good!" Johnson was aware of the Quality of Earnings Report's claims regarding grossly inflated returns and supervised the individual who approved those claims. Johnson should have viewed the Backward Hat Common Enterprise's ability to edit and approve a purportedly independent review of its own business as a red flag.

60. Defendants leveraged the sham Audit Report and Quality of Earnings Report to solicit additional pool participants. For example, during the Relevant Period, Johnson offered to share the Quality of Earnings Report while encouraging a prospective pool participant to contribute to the Backward Hat Pool. On or about November 19, 2025, Johnson emailed the Audit Report and the Quality of Earnings Report to prospective pool participants in connection with his efforts to solicit their contributions. According to the AI-generated summary of the December 15, 2025 meeting discussed above, "[Johnson] presented audit results for 2024, showing the fund grew . . . and experienced strong returns . . . . [Johnson] also mentioned that the [Backward Hat Common Enterprise was] audited by . . . a boutique firm that specializes in financial audits." Likewise, on or about January 30, 2026, Johnson contacted a prospective pool participant, noting that it would be a good time to invest in the Backward Hat Pool and offered to send him the Quality of Earnings Report. Johnson texted that pool participant on or around that date, attaching the Quality of Earnings Report and stating, "Hey buddy sending you some bh info[.] 100k min to get in, 4 month hold period after that free to go from there as discussed[.]

Below is a pdf of QoE for jan- July 25'[.] Also some snap shots of growth. I can do a zoom with you and a lot more in-depth." On or about June 24, 2026, the Backward Hat Common Enterprise, by and through Employee 1, emailed a prospective pool participant the Quality of Earnings Report to substantiate false claims about the Backward Hat Common Enterprise's activities, including that it was trading forex profitably.

### F. The Backward Hat Common Enterprise Provided Fake Account Statements Purporting to Show the Backward Hat Common Enterprise's Trading Profits.

61. The Backward Hat Common Enterprise provided fake account statements through its account portal purporting to show pool participants' account balances and monthly returns. For example, on or about October 9, 2024, the Backward Hat Common Enterprise account portal displayed to a pool participant $85,000 in total contributions since July, more than $13,000 in "Net income: Unrealized Gain[s]," and an account balance exceeding $98,000. Similarly, beginning in or around March 2025 through at least October 2026, the Backward Hat Common Enterprise account portal displayed to a pool participant monthly gains of 6% or more and never showed a negative month. In or around November 2025, the Backward Hat Common Enterprise account portal displayed another pool participant's account balance purporting to show consistent monthly gains exceeding 6% per month from April through November 2025. Lastly, in or around March 2026, the Backward Hat Common Enterprise account portal similarly purported to show monthly gains exceeding 6-7% per month from March 2024 through February 2026 for yet another pool participant.

62. These account statements were all false because they falsely reported gains on the Backward Hat Common Enterprise's supposed forex trading, which was not occurring.

**G. Defendants' Fraud Operated from the United States and Targeted U.S. Victims.**

63. Defendants operated their fraud from the United States. All Defendants are based in Indiana. Defendants used U.S.-based bank accounts and the U.S.-based Coinbase Account to misappropriate funds.

64. From the United States, Defendants targeted U.S. victims. For example, an internal Backward Hat Common Enterprise file purports to identify certain pool participants and list their contributions, distributions, and account balances as of February 2025. The file lists 730 unique Account IDs, including multiple account IDs for certain individual pool participants. At least 698 of the 730 Account IDs identify the "United States" as the "Account country," a U.S. state as the "Account state," or both.

**H. At Least One Pool Participant Told Williams That the Backward Hat Pool Appeared to Be a Scam.**

65. In or around February 2023, Devin Johnson and another representative of the Backward Hat Common Enterprise met with prospective pool participants in Florida. During the meeting, the representative touted the Backward Hat Common Enterprise's purportedly profitable forex trading strategy. After the meeting, one of the prospective pool participants spoke to Williams on the phone, stating that the Backward Hat Pool appeared to be a scam, and that someone who worked for Williams was claiming outlandish forex trading success. Williams told the pool participant that Williams disagreed and that the Backward Hat Pool was real and legitimate.

**I. Defendants' Fraud Is Ongoing and Has Caused Massive Losses to Pool Participants.**

66. Defendants' fraud is ongoing. Defendants have continued to accept pool participant contributions in recent months, including around $15 million in pool participant

contributions in September 2026 and around $2.4 million in pool participant contributions from October 1 through October 9, 2026.

67. In or around August 2026, the Backward Hat Common Enterprise began experiencing long delays in paying scheduled withdrawals to pool participants. On or about September 26, 2026, a pool participant emailed Williams, Johnson, Harvey, and others to complain about the "long delay[s]," state that Defendants were "failing [their] investors," and describe extreme personal hardships resulting from the delays, including, in one instance, an inability to close on a new home. Williams replied that he would give the pool participant a call to discuss the matter.

68. Throughout October 2026, pool participants complained to Defendants regarding delayed payments, and representatives of the Backward Hat Common Enterprise falsely promised that payments would soon come and made misrepresentations regarding those delays, including that a transition in prime-broker arrangements slowed how quickly they could liquidate open trading positions and receive funds back to pay withdrawals.

69. To date, while the Backward Hat Common Enterprise returned funds to certain pool participants, over 1,800 pool participants lost at least $390 million as a result of Defendants' fraud.

**J. Defendants Knew or Recklessly Disregarded That the Backward Hat Common Enterprise Was a Fraud.**

70. Williams and the Backward Hat Common Enterprise knew or recklessly disregarded that the Backward Hat Common Enterprise was operating a fraudulent scheme. First, as a signatory on every Backward Hat Common Enterprise bank account and the Coinbase Account, Williams knew or was reckless in not knowing that the Backward Hat Common Enterprise was not engaging in forex trading as promised and instead was a Ponzi scheme,

misappropriating pool participant funds, and using new pool participant funds to satisfy withdrawal requests of other pool participants. Second, as the creator, Executive Officer and Director, and Registered Agent of the Backward Hat Common Enterprise, Williams had substantial visibility into the Backward Hat Common Enterprise's operations and the ability to determine how pool participant funds were being used. Third, Williams received more than $144 million in misappropriated pool participant funds through bank transfers to KMAP and crypto asset transfers to his personal wallets, all from bank accounts or the Coinbase Account that Williams controlled. Williams knew or was reckless in not knowing that the Backward Hat Common Enterprise was not generating the significant forex trading returns required to pay him such an astronomical sum. Williams knew (from the PPMs that he signed) that the Backward Hat Common Enterprise *in total* was entitled to only 20% of the Backward Hat Common Enterprise's supposed forex trading profits, a 2% management fee, and certain expenses, and that only those funds could be used to pay him the above large sum in addition to funds owed to Johnson, Harvey, and others. Likewise, because the Backward Hat Common Enterprise owned the relevant bank accounts and Coinbase Account, it knew or was reckless in not knowing that little or no forex trading took place and that participant funds were widely misappropriated and used to make Ponzi payments. The material misstatements and omissions made by Williams and the Backward Hat Common Enterprise were made with knowledge or reckless disregard of their falsity.

71. Johnson also knew or recklessly disregarded that the Backward Hat Common Enterprise was operating a fraudulent scheme. First, Johnson was a signatory for two Backward Hat Common Enterprise bank accounts, one of which directly received nearly 70% of pool participant funds. He therefore had access to information reflecting the disposition of most pool

participant funds. Second, as an Executive Officer and Director of multiple entities in the Backward Hat Common Enterprise, Johnson had substantial visibility into the Backward Hat Common Enterprise's operations and the ability to determine how pool participant funds were being used. Third, Johnson received more than $46 million in misappropriated pool participant funds through bank transfers to his personal bank account and to the Johnson Group—of which he was the sole Member and which he controlled—and through crypto asset transfers to his personal wallets. This amount included over $43 million transferred from the two Backward Hat Common Enterprise bank accounts on which he was a signatory. Johnson knew or was reckless in not knowing that the Backward Hat Common Enterprise was not generating the significant forex trading returns required to pay him such an astronomical sum. Johnson knew (at least from the PPMs) that the Backward Hat Common Enterprise *in total* was entitled to only 20% of the Backward Hat Common Enterprise's supposed forex trading profits, a 2% management fee, and certain expenses, and that only those funds could be used to pay him the above large sum in addition to funds owed to Williams, Harvey, and others. Fourth, throughout the Relevant Period, Johnson made outlandish claims about the Backward Hat Common Enterprise's purportedly profitable forex trading without conducting sufficient diligence to verify his claims. Fifth, Johnson met with a prospective pool participant in which he acknowledged that the Backward Hat Common Enterprise had previously operated "Ponzi schemes," and then falsely claimed that the conduct had stopped and that the enterprise was profitably trading forex. Sixth, Johnson was copied on an email in which a Backward Hat Common Enterprise representative directed revisions to and approved the draft Quality of Earnings Report. The email reflected his awareness of the outlandish claims of trading profits in the Quality of Earnings Report as well as

the fact that the entity under review was allowed to revise and approve the supposedly independent review. These red flags should have put Johnson on notice of the fraud.

72. At minimum, all of Defendants' conduct operated as a fraud on pool participants.

**K. The Backward Hat Common Enterprise Illegally Operated the Pool.**

73. The Backward Hat Common Enterprise acted as a CPO during the Relevant Period by soliciting, accepting, and/or receiving funds from pool participants for participation in the Backward Hat Pool.

74. The Backward Hat Common Enterprise, while acting as the CPO of the Backward Hat Pool, failed to operate the Backward Hat Pool as a legal entity separate from that of the CPO and commingled pool funds with non-pool property by transferring pool funds into accounts and crypto asset wallets owned by Williams, Johnson, Harvey, and entities they owned and controlled that contained non-pool funds.

**L. Williams Controlled the Backward Hat Common Enterprise.**

75. During the Relevant Period, Williams served as an Executive Officer and Director of multiple, if not all, entities in the Backward Hat Common Enterprise. He was a signatory on every bank account maintained by the Backward Hat Common Enterprise, opened and controlled the Coinbase Account, and served as the Indiana Registered Agent for every entity in the Backward Hat Common Enterprise. Williams's home address was publicly listed as the address for all but one entity in the Backward Hat Common Enterprise (with an address for the remaining entity at a business where Williams previously worked as an investment advisor). On behalf of the Backward Hat Common Enterprise, Williams was identified in PPMs as the person to whom inquiries about contributions to the Backward Hat Pool should be directed. He was also the signatory, through Employee 1 who signed "on behalf of Phil Williams," on PPMs provided to pool participants. Those PPMs contained misrepresentations regarding the purported forex

trading at the heart of the fraudulent scheme described herein, the applicable fee structure, and the manner in which the Backward Hat Common Enterprise would transfer and maintain pool participant funds. Williams also signed the Limited Partnership Agreements appended to the PPMs and was the named signatory on the Subscription Agreements appended to the PPMs, all on behalf of the Backward Hat Common Enterprise.

76. The Backward Hat Common Enterprise's employees communicated to pool participants that Williams operated the Backward Hat Common Enterprise. For example, on or about January 28, 2026, Employee 1 emailed a prospective pool participant and referred to Williams as "[o]ur Managing Partner." On or about February 11, 2026, Employee 1 emailed a prospective pool participant, noting that "[o]nce you've completed all of the sections and electronically signed, the document will go to [Williams] for his signature. Once [Williams] has signed off, you'll be in the fund and we'll send over the wire instructions so you'll be ready to go!" Similarly, in or around 2024, Williams spoke with a pool participant about the pool participant's desire to participate in the Backward Hat Pool and whether Williams would accept the pool participant's contribution.

**M. Relief Defendants Received Misappropriated Pool Participant Funds.**

77. During the Relevant Period, the Backward Hat Common Enterprise transferred at least $3,045,393.34 in misappropriated pool participant funds to Harvey. Harvey has no legitimate claim to pool participant funds and did not provide any services for the Backward Hat Pool or pool participants.

78. During the Relevant Period, the Backward Hat Common Enterprise transferred at least $92,938,603.52 in misappropriated pool participant funds to KMAP. KMAP has no legitimate claim to pool participant funds and did not provide any services for the Backward Hat Pool or pool participants.

79. During the Relevant Period, the Backward Hat Common Enterprise transferred at least $41,423,030.59 in misappropriated pool participant funds to Johnson Group. Johnson Group has no legitimate claim to pool participant funds and did not provide any services for the Backward Hat Pool or pool participants.

80. During the Relevant Period, the Backward Hat Common Enterprise transferred at least $27,297,146.30 in misappropriated pool participant funds to Harvey Group. Harvey Group has no legitimate claim to pool participant funds and did not provide any services for the Backward Hat Pool or pool participants.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**Violations of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3)**
**(Fraud in Connection with Forex)**

**(All Defendants)**

81. Paragraphs 1 through ## are realleged and incorporated herein by reference.

82. 7 U.S.C. § 6b(a)(2)(A)–(C) makes it unlawful:

> (2) [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with any other person, other than on or subject to the rules of a designated contract market
>
> > (A) to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
> >
> > (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

83. 7 U.S.C. § 1a(18)(A)(xi) defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

84. Defendants offered pool participants, at least some of whom were not ECPs, forex agreements, contracts, or transactions on a leveraged, margined, and/or financed basis.

85. Pursuant to 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to the forex agreements, contracts, or transactions offered by Defendants "as if" they were contracts of sale of a commodity for future delivery. Further, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes the forex agreements, contracts, or transactions here "subject to" 7 U.S.C. § 6b. Finally, 7 U.S.C. § 2(c)(2)(C)(vii) makes clear the CFTC has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of forex transactions described in 7 U.S.C. § 2(c)(2)(C)(i).

86. 17 C.F.R. § 5.2(b)(1)–(3) makes it unlawful for any person, by use of the mails or by any instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

87. As described herein, the Backward Hat Common Enterprise, by and through its officers, employees, and agents, and Williams and Johnson cheated or defrauded or attempted to cheat or defraud, and willfully deceived or attempted to deceive, other persons in connection with the offering of, or entering into, off-exchange leveraged or margined forex transactions with non-ECPs, by, among other things, engaging in the following conduct, while using the mails or

other instrumentalities of interstate commerce, including through emails and transfers of fiat currency between bank accounts and of crypto assets on the blockchain, in violation of 7 U.S.C. § 6b(a)(2)(A), (C) and 17 C.F.R. § 5.2(b)(1), (3):

a. Misappropriating almost all pool participant funds by failing to trade forex as promised, making Ponzi payments, and transferring tens of millions of dollars to Williams, Johnson, and Harvey and the entities they owned;

b. Misrepresenting the Backward Hat Common Enterprise's historical forex trading performance;

c. Misrepresenting that the Backward Hat Common Enterprise would use pool participant funds to trade forex;

d. Circulating a sham Audit Report and Quality of Earnings Report purporting to confirm the Backward Hat Common Enterprise's remarkable forex trading performance;

e. Circulating fake account statements showing false account balances and non-existent trading gains; and

f. Omitting the material facts that they were not trading forex as promised, but instead making Ponzi payments, and transferring tens of millions of dollars to Williams, Johnson, and Harvey and the entities they owned.

88. As described herein, the Backward Hat Common Enterprise, by and through its officers, employees, and agents, willfully made or caused to be made false account statements, in violation of 7 U.S.C. § 6b(a)(2)(B) and 17 C.F.R. § 5.2(b)(2).

89. The foregoing acts, omissions, and failures by Williams and Johnson occurred within the scope of their employment, agency, or office with the Backward Hat Common Enterprise during the Relevant Period. Pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2026), Williams's and Johnson's acts, omissions, and failures are deemed the acts, omissions, and failures of the Backward Hat Common Enterprise. Therefore, the Backward Hat Common Enterprise violated 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3) based on those acts, omissions, and failures.

90. Williams held and exercised direct and indirect control over the Backward Hat Common Enterprise and either did not act in good faith or knowingly induced the Backward Hat Common Enterprise's violations of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3) during the Relevant Period. As a controlling person of the Backward Hat Common Enterprise, Williams is liable for the Backward Hat Common Enterprise's violations of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3) pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b).

91. Each material misrepresentation, material omission, issuance of a false statement, or act of misappropriation made by Defendants, including but not limited to those specifically alleged herein, is a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)–(C).

## COUNT II

### Violation of 7 U.S.C. § 6*o*(1)(A)–(B)
### (Fraud and Deceit by a CPO and APs of a CPO)

### (All Defendants)

92. Paragraphs 1 through ## are realleged and incorporated herein by reference.

93. During the Relevant Period, the Backward Hat Common Enterprise acted as a CPO, as defined by 7 U.S.C. § 1a(11), by soliciting, accepting, or receiving funds or property from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in off-exchange, leveraged or margined retail forex transactions.

94. For the purposes of retail forex transactions, a CPO is defined in Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1), as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant as defined in

[7 U.S.C. § 1a(18)], and who engages in retail forex transactions." The Backward Hat Pool was not an ECP as defined in 7 U.S.C. § 1a(18).

95. An AP of a CPO is defined by Regulation 1.3, 17 C.F.R. § 1.3, as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged. Throughout the Relevant Period, Williams and Johnson acted as APs of the Backward Hat Common Enterprise (which was acting as a CPO) by soliciting funds or property for participation in the Backward Hat Pool and/or supervising other persons so engaged.

96. Likewise, an AP of a retail forex CPO is defined by 17 C.F.R. § 5.1(d)(2) as any person associated with a retail forex CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves: (i) [t]he solicitation of funds, securities, or property for a participation in a pooled vehicle; or (ii) [t]he supervision of any person or persons so engaged[.]"

97. Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex, and accounts or pooled investment vehicles in retail forex, "shall be subject to . . . [7 U.S.C. § 6*o*]," except in circumstances not relevant here.

98. 7 U.S.C. § 6*o*(1)(A)–(B) prohibits CPOs and APs of CPOs, whether registered with the CFTC or not, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any actual or prospective pool participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any actual or prospective pool participant.

99. As described herein, the Backward Hat Common Enterprise, by and through their officers, employees, and agents, and Williams and Johnson (each acting as APs of the Backward Hat Common Enterprise CPO) employed a device, scheme, or artifice to defraud pool participants and prospective pool participants or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon any pool participant or prospective pool participant by, among other things, engaging in the following conduct, while using the mails or other instrumentalities of interstate commerce, including through emails and transfers of fiat currency between bank accounts and of crypto assets on the blockchain, in violation of 7 U.S.C. § 6*o*(1)(A)–(B):

a. Misappropriating almost all pool participant funds by failing to trade forex as promised, making Ponzi payments, and transferring tens of millions of dollars to Williams, Johnson, and Harvey and the entities they owned;

b. Misrepresenting the Backward Hat Common Enterprise's historical forex trading performance;

c. Misrepresenting that the Backward Hat Common Enterprise would use pool participant funds to trade forex;

d. Circulating a sham Audit Report and Quality of Earnings Report purporting to confirm the Backward Hat Common Enterprise's remarkable forex trading performance;

e. Circulating fake account statements showing false account balances and non-existent trading gains; and

f. Omitting the material facts that they were not trading forex as promised, but instead making Ponzi payments, and transferring tens of millions of dollars to Williams, Johnson, and Harvey and the entities they owned.

100. The foregoing acts, omissions, and failures by Williams and Johnson occurred within the scope of their employment, agency, or office with the Backward Hat Common Enterprise during the Relevant Period. Pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Williams's and Johnson's acts, omissions, and failures are deemed the acts, omissions, and

failures of the Backward Hat Common Enterprise. Therefore, the Backward Hat Common Enterprise violated 7 U.S.C. § 6*o*(1)(A)–(B) based on those acts, omissions, and failures.

101. Williams held and exercised direct and indirect control over the Backward Hat Common Enterprise and either did not act in good faith or knowingly induced the Backward Hat Common Enterprise's violations of 7 U.S.C. § 6*o*(1)(A)–(B) during the Relevant Period. As a controlling person of the Backward Hat Common Enterprise, Williams is liable for the Backward Hat Common Enterprise's violations of 7 U.S.C. § 6*o*(1)(A)–(B) pursuant to 7 U.S.C. § 13c(b).

102. Each material misrepresentation, material omission, issuance of a false statement, or act of misappropriation made by Defendants, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)–(B).

## COUNT III

### Violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3)
### (Fraud by Deceptive Device or Contrivance)

### (All Defendants)

103. Paragraphs 1 through ## are realleged and incorporated herein by reference.

104. 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the [CFTC] shall promulgate . . . .

105. 17 C.F.R. § 180.1(a), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person[.]

106. Pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex, and accounts or pooled investment vehicles in retail forex, "shall be subject to . . . [7 U.S.C. § 9]," except in circumstances not relevant here.

107. As described herein, in connection with agreements, contracts, or transactions in retail forex, and/or accounts or pooled investment vehicles in retail forex, Defendants intentionally or recklessly: (i) used or employed, or attempted to use or employ, manipulative or deceptive devices or contrivances; (ii) made or attempted to make untrue or misleading statements of material fact or omitted to state a material fact; and/or (iii) engaged or attempted to engage in an act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, by engaging in the following conduct, while using the mails or other instrumentalities of interstate commerce, including through emails and transfers of fiat currency between bank accounts and of crypto assets on the blockchain, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3):

(a) Misappropriating almost all pool participant funds by failing to trade forex as promised, making Ponzi payments, and transferring tens of millions of dollars to Williams, Johnson, and Harvey and the entities they owned;

(b) Misrepresenting the Backward Hat Common Enterprise's historical forex trading performance;

(c) Misrepresenting that the Backward Hat Common Enterprise would use pool participant funds to trade forex;

(d) Circulating a sham Audit Report and Quality of Earnings Report purporting to confirm the Backward Hat Common Enterprise's remarkable forex trading performance;

(e) Circulating fake account statements showing false account balances and non-existent trading gains; and

(f) Omitting the material facts that they were not trading forex as promised, but instead making Ponzi payments, and transferring tens of millions of dollars to Williams, Johnson, and Harvey and the entities they owned.

108. The foregoing acts, omissions, and failures by Williams and Johnson occurred within the scope of their employment, agency, or office with the Backward Hat Common Enterprise during the Relevant Period. Pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Williams's and Johnson's acts, omissions, and failures are deemed the acts, omissions, and failures of the Backward Hat Common Enterprise. Therefore, the Backward Hat Common Enterprise violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) based on those acts, omissions, and failures.

109. Williams held and exercised direct and indirect control over the Backward Hat Common Enterprise and either did not act in good faith or knowingly induced the Backward Hat Common Enterprise's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) during the Relevant Period. As a controlling person of the Backward Hat Common Enterprise, Williams is liable for the Backward Hat Common Enterprise's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) pursuant to 7 U.S.C. § 13c(b).

110. Each material misrepresentation, material omission, issuance of a false statement, or act of misappropriation made by Defendants, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

**COUNT IV**

**Violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), 6k(2), and 17 C.F.R. §§ 5.3(a)(2)(i), (ii)**
**(Failure to Register as a CPO; Failure to Register as APs of a CPO)**

**(All Defendants)**

111. 7 U.S.C. § 6m(1) makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

112. Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) states in part, that:

> A person, unless registered in such capacity as the [CFTC] by rule, regulation, or order shall determine and a member of a futures association registered under section 17, shall not . . .
>
> . . . .
>
> (cc) operate or solicit funds, securities, or property for any pooled investment vehicle that is not an eligible contract participant in connection with [applicable retail forex agreements, contracts, or transactions].

113. Except in circumstances not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(i) require those that meet the definition of a retail forex CPO under 17 C.F.R. § 5.1(d)(1) to register as a CPO with the CFTC.

114. During the Relevant Period, the Backward Hat Common Enterprise acted as a CPO by engaging in a business that was in the nature of a commodity pool, investment trust, syndicate, or similar enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or otherwise, for the purpose of trading in off-exchange leveraged, margined or financed forex transactions with persons who were not ECPs, and through use of the mails or any instrumentality of interstate commerce, including through emails and transfers of fiat currency between bank accounts and of crypto assets on the

blockchain, while failing to register with the CFTC as a CPO, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i). During the Relevant Period, the Backward Hat Common Enterprise was not exempt from registration as a CPO.

115. 7 U.S.C. § 6k(2) makes it unlawful for any person to be associated with a CPO as an officer or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool, unless such person is registered with the CFTC as an AP of a CPO.

116. Except in certain circumstances not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii) require those that meet the definition of an AP of a retail forex CPO under 17 C.F.R. § 5.1(d)(2) to register as an AP of a CPO with the CFTC.

117. During the Relevant Period, Williams and Johnson were associated with the Backward Hat Common Enterprise (a CPO) as officers or agents in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, while failing to register with the CFTC as APs of the Backward Hat Common Enterprise (a CPO), all in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii). Throughout the Relevant Period, Williams and Johnson were not exempt from the requirement to register as APs of a CPO.

118. 7 U.S.C. § 6k(2)(ii) makes it unlawful for a CPO to allow its agents or officers to solicit funds, securities, or property for participation in a commodity pool without such persons being registered as APs of the CPO, if the CPO knew or should have known that such persons were not registered as APs of the CPO.

119. During the Relevant Period, the Backward Hat Common Enterprise (a CPO) knew or should have known that Williams and Johnson were associated with them as officers or agents

in a capacity that involved the solicitation of funds, securities, or property for participation in the Backward Hat Pool, while failing to register with the CFTC as APs of the Backward Hat Common Enterprise, in violation of 7 U.S.C. § 6k(2)(ii).

120. Williams held and exercised direct and indirect control over the Backward Hat Common Enterprise and either did not act in good faith or knowingly induced the Backward Hat Common Enterprise's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 6k(2), and 17 C.F.R. §§ 5.3(a)(2)(i), (ii) during the Relevant Period. As a controlling person of the Backward Hat Common Enterprise, Williams is liable for the Backward Hat Common Enterprise's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 6k(2)(ii), and 17 C.F.R. §§ 5.3(a)(2)(i) pursuant to 7 U.S.C. § 13c(b).

## COUNT V

**Violations of 17 C.F.R. § 4.20(a)(1), (b), (c)**
**(Failure to Operate Commodity Pool as a Separate Legal Entity, Failure to Receive Funds in the Pool's Name, and Commingling of Pool Funds)**

**(Defendant Williams and the Backward Hat Common Enterprise)**

121. 17 C.F.R. § 4.20(a)(1) requires a CPO to operate its commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, with certain specified exceptions not applicable here.

122. During the Relevant Period, the Backward Hat Common Enterprise, while acting as a CPO, violated 17 C.F.R. § 4.20(a)(1) by failing to operate the commodity pool as a legal entity separate from itself.

123. 17 C.F.R. § 4.20(b) provides, "All funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name."

124. During the Relevant Period, the Backward Hat Common Enterprise, while acting as a CPO, violated 17 C.F.R. § 4.20(b) by receiving funds from pool participants for the purchase of an interest in the pool without receiving the same in the pool's name.

125. 17 C.F.R. § 4.20(c) provides, "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

126. During the Relevant Period, the Backward Hat Common Enterprise, while acting as a CPO, violated 17 C.F.R. § 4.20(c) by commingling pool funds with the personal funds of Williams.

127. Williams held and exercised direct and indirect control over the Backward Hat Common Enterprise and either did not act in good faith or knowingly induced the Backward Hat Common Enterprise's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) during the Relevant Period. As a controlling person of the Backward Hat Common Enterprise, Williams is liable for the Backward Hat Common Enterprise's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) pursuant to 7 U.S.C. § 13c(b).

## VI. RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Enter an order finding that Defendants violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A), (C), 6k(2), 6*o*(1)(A)–(B), 9(1), and 17 C.F.R. §§ 5.2(b)(1), (3), 180.1(a)(1)–(3); further finding that Williams and Johnson violated 17 C.F.R. § 5.3(a)(2)(ii); and further finding that Williams and the Backward Hat Common Enterprise violated 7 U.S.C. §§ 6b(a)(2)(B), 6m(1), and 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.2(b)(2), 5.3(a)(2)(i).

B. Enter an order of permanent injunction restraining, enjoining, and prohibiting Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and any other person or entity in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in conduct in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A), (C), 6k(2), 6*o*(1)(A)–(B), 9(1), and 17 C.F.R. §§ 5.2(b)(1), (3), 180.1(a)(1)–(3); further restraining, enjoining, and prohibiting Williams and Johnson, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and any other person or entity in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in conduct in violation of 17 C.F.R. § 5.3(a)(2)(ii); and further restraining, enjoining, and prohibiting Williams and the Backward Hat Common Enterprise, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and any other person or entity in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in conduct in violation of 7 U.S.C. § 6m(1) and 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.3(a)(2)(i);

C. Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3) Having any commodity interest traded on any Defendants' behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2026); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2026)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

D. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the CEA and Regulations as described herein, including pre-judgment and post-judgment interest;

E. Enter an order directing Relief Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all ill-gotten gains to which they have no legitimate claim including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts

or practices which constitute violations of the CEA and Regulations as described herein, including pre-judgment and post-judgment interest;

F. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

G. Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to pay civil monetary penalties assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2026), or subsequent annually adjusted amounts, for each violation of the CEA and Regulations, as described herein;

H. Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2);

I. Enter an order appointing a receiver; and

J. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: November 17, 2026

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

*/s/ Anthony C. Biagioli*
Anthony C. Biagioli
MO Bar No. 72434
abiagioli@cftc.gov
Thomas L. Simek
NY Bar No. 4166161
tsimek@cftc.gov
2600 Grand Boulevard, Suite 210
Kansas City, MO 64108
(816) 960-7700 (telephone)
(816) 960-7750 (facsimile)